# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David L. Scrip, Jr., : 
             Petitioner : 
               : 
        v. :   No. 2138 C.D. 2014
               :   Submitted:  September 25, 2015
Unemployment Compensation : 
Board of Review, : 
             Respondent : 


BEFORE:  HONORABLE RENÉE COHN JUBELIRER, Judge
             HONORABLE P. KEVIN BROBSON, Judge
             HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge


*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**         **FILED:  January 29, 2016**


Petitioner David L. Scrip, Jr., (Claimant) petitions this Court for review of an order of the Unemployment Compensation Board of Review (Board). The Board affirmed the Unemployment Compensation Referee's (Referee) decision, thereby denying unemployment compensation benefits to Claimant under Section 402(e) of the Unemployment Compensation Law (Law).[1]  For the reasons discussed below, we reverse.

Claimant filed for unemployment benefits after Washington County Juvenile Probation (Employer) terminated his employment on February 18, 2014. The Duquesne Service Center (Service Center) issued a determination finding

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e).

Claimant eligible for benefits. (Certified Record (C.R.), Item No. 5.) Employer appealed the Service Center's determination, arguing that Claimant was fired for willful misconduct—namely, violating a directive not to spread rumors or undermine management. (C.R., Item No. 6.)

At the evidentiary hearing before the Referee, Employer presented the testimony of Deputy Court Administrator for Probation Services Thomas S. Jess (Jess), Chief Juvenile Probation Officer Daniel Clements (Clements), and Juvenile Probation Officers Henry Billingsly (Billingsly), Monica Baronick (Baronick), Jason Kozar (Kozar), and Kelly Boyd (Boyd). Claimant testified on his own behalf.

Jess testified that he fired Claimant on February 18, 2014, after receiving "information based on investigation that he was violating the president judge's directive . . . [that] she wouldn't tolerate further dissention and efforts to undermine the chief juvenile probation officer." (Reproduced Record (R.R.) 14.) Jess testified that he "was told in February that . . . [Claimant] was spreading rumors and gossip to other probation officers that the assistant chief [(Karen LaBarre)] was going to see the president judge to complain about Chief Clements." (R.R. 26.) According to Jess, several juvenile probation officers reported to Clements and a supervisory probation officer, Jack Thomas, that Claimant was spreading rumors about what he referred to as the LaBarre meeting, and then Clements and Thomas reported that information to Jess. (R.R. 27.) Clements told Jess that Claimant was saying that "Karen LaBarre, the assistant chief, was going to the president judge, [to] quote, gut chief juvenile probation officer Dan Clements." (R.R. 37-38.) Jess further testified that Boyd "confirmed" to him that Claimant "was down at Ringgold High School, telling the probation

2

officers at the high school that Karen LaBarre was going to the president judge to complain." (R.R. 28.) Jess stated that this undermined the leadership of the probation office because "[w]hen a probation officer's [sic] going around, talking about the assistant chief having a meeting with the president judge about the chief, then the appearance is that the chief's in trouble, and that's not helping the environment to run an office." (R.R. 40.)

Jess also testified that several previous incidents of misconduct contributed to his decision to fire Claimant. (R.R. 14.) Specifically, he referenced an incident when Claimant failed to respond to an emergency call while on-call in August of 2012, (R.R. 17), and two times Claimant was "untruthful in Court," once in March of 2012 and once in the summer of 2012, (R.R. 24-25).

Billingsly testified that both he and Claimant were present at a meeting in August of 2012 where President Judge O'Dell Seneca told the entire juvenile probation office that she "will not tolerate any attacks . . . against Mr. Clements or our office." (R.R. 53.)

Baronick testified that she and Claimant parked near each other in the parking garage and frequently discussed work when they saw each other in the garage. (R.R. 58.) She further testified that Claimant once asked her if she knew about the meeting between LaBarre and the president judge or what the meeting was about. Baronick answered that she knew about the meeting and that, while she did not know what the meeting was about, she speculated that it could be about a heated conversation she overheard the previous day between LaBarre and Ray Thomas. (R.R. 59.) Baronick testified that Claimant brought up the meeting and "just asked me if I knew what it's [sic] about." (R.R. 59.)

3

Kozar testified that while at Ringgold High School, Claimant asked him "if I heard about a meeting between Ms. LaBarre and the president judge." (R.R. 65.) Kozar replied that he had not heard about the meeting, and the conversation moved to another topic. (R.R. 65-66.) Kozar further testified that while this conversation was taking place, a secretary and some students were in or around the office and may have overheard some of it. (R.R. 66.) After Claimant was fired, Kozar reported the conversation to Clements because he "didn't have good vibes" about it. (R.R. 67.)

Boyd, also present for the conversation at Ringgold High School, testified that Claimant made a comment about LaBarre going to see the president judge and then left. (R.R. 70.) Boyd testified that he had not known about any meeting between LaBarre and the president judge. (R.R. 70.) He also testified that there were no adults present in the guidance office to overhear the conversation and could not recall whether there were any students around at the time. (R.R. 70.) Boyd told Jess about the conversation at Ringgold High School when Jess asked him about it, after Claimant was fired. (R.R. 71.)

Clements testified that he learned about Claimant's questions from Jack Thomas, who told Clements that "Mr. Boyd and others had told [Mr. Thomas] that [Claimant] was going around, talking to [probation officers], saying that Ms. LaBarre was going to have a conversation with the president judge (inaudible), Tom Jess, and myself." (R.R. 79.) Clements further testified that hearing this made him feel "not good" and that he felt Claimant was undermining him because "anytime you (inaudible) indicating what conversation may or may not take place with - - regarding somebody, I think that's undermining somebody, yes."

4

(R.R. 79.) Clements testified that when he confronted Claimant, Claimant did not deny repeating that the meeting was taking place. (R.R. 80.)

On cross-examination, Clements testified as follows:

CL: . . . Now when Mr. Scrip made a comment to Mr. Kozar and the comment apparently was did you hear Karen LaBarre's going to have a meeting with the judge, that was the comment he made?

. . . .

[CLEMENTS]: . . . I believe that was the context of the conversation, yes.

CL: Okay. And so what? An employee is not allowed, in your office, to say to another employee, doesn't so-and-so have a meeting with so-and-so next week?

[CLEMENTS]: Oh, they certainly are allowed to say that, yes.

. . . .

CL: Okay. So what was wrong about Scrip making that comment?

. . . .

[CLEMENTS]: It's inappropriate.

CL: How?

[CLEMENTS]: I think I can figure out what he's doing when he asked that.

CL: Okay. What was he doing?

[CLEMENTS]: Putting his nose in somewhere where it doesn't belong. It doesn't concern him. He should be doing probation work.

(R.R. 85-86.)

Claimant testified that he asked Kozar, Baronick, and Boyd whether they knew anything about a meeting taking place between Karen LaBarre and the president judge. (R.R. 91, 106.) Claimant believed the meeting was about the distribution of overtime and Mixed Martial Arts (MMA) training, issues which concerned him as a member of the office. (R.R. 91.) Claimant further testified

5

that the willful misconduct charge was a pretext, and that he was actually fired for admitting authorship of an anonymous letter complaining of improper placement of children at Abraxas facilities. (R.R. 90.) The letter alleged that Clements was in a romantic relationship with Abraxas' court representative, Beth Stutzman, and that Clements directed that children be placed in Abraxas facilities, even if not in the best interest of the child, in order to curry favor with or help his girlfriend. (R.R. 123-29.) Claimant testified that he sent the anonymous letter to President Judge O'Dell Seneca in May of 2012, and that it was sent anonymously for fear of reprisal. (R.R. 97-98.) Claimant testified that he received notification about the meeting with Jess, in which he was fired, the day after he first publically admitted writing the 2012 letter. (R.R. 90-91.)

The Referee issued a decision and order reversing the Service Center's determination and concluding that Claimant was ineligible for benefits because he was fired for willful misconduct. The Referee made the following Findings of Fact:

1. The claimant was an employee of the Washington County Juvenile Probation office for approximately 25 years. The claimant['s] final position was Probation Officer 2 with a pay rate of $30.40 per hour. The claimant's last day of work was February 18, 2014.

2. The claimant was discharged on February 18, 2014, due to the employer determining the claimant had spread rumors or created dissention with the Probation Department.

3. There had been a change in management sometime in 2009 or 2010 and a Presiding Judge of Washington County had given instruction to all Probation Officers that dissention and undermining of management would not be tolerated.

6

4. The claimant met with a member of management indicating that he would offer support to the Chief of [the] Juvenile Probation Department.

5. The claimant was aware that the Assistant to the Chief planned to meet with the President Judge regarding issues within the Probation office.

6. The claimant spoke with other Probation Officers to determine what if anything they were aware of regarding the meeting.

7. The claimant had no specific information regarding the meeting or the intent of the meeting.

8. The claimant continued speaking with other Probation Officers to determine the purpose or the outcome of the meeting.

9. Sometime prior to this incident the claimant had written a letter raising issues within the department and the choice of a provider for juveniles needing probation.

10. The claimant's letter was sent anonymously and resulted in an investigation of the department which was found to be meeting state requirements.

11. The claimant felt that the discharge was retaliation for the anonymous letter he had sent approximately 2 years prior to his termination

12. The employer did not retaliate for the claimant's letter.

(R.R. 1-2.)

The Referee did not find credible Claimant's allegation that he was fired because of the 2012 letter, despite Claimant's sincere belief. (R.R. 2.) Instead, the Referee concluded that Claimant was fired for willful misconduct:

> [T]he employer has indicated that the claimant was discharged due to continued violation of a directive by the President Judge where the claimant continued to spread rumors or ask questions regarding issues in an effort to undermine the management of the department. The claimant does not dispute that he did question other

7

Probation offices [sic] regarding an Assistant Chief and a meeting scheduled with the President Judge. The claimant was not in a position to need to know the purposes of such meeting. The claimant was aware and acknowledged awareness that he was not to cause dissention within the department. The claimant's continued questioning of other Probation Officers regarding [a] meeting of which the claimant was not directly involved is clearly a violation of the directive by the President Judge.

The claimant's continued questioning and efforts to spread rumors is clearly a disregard of the employer expectations and constituted willful misconduct . . . .

(R.R. 2.) The Referee, therefore, denied Claimant unemployment benefits under Section 402(e) of the Law. On appeal, the Board adopted the Referee's findings of fact and conclusions of law and affirmed the denial of benefits, noting that the 2012 letter was sent nearly two years prior to Claimant's discharge and that the record indicates that his violation of the president judge's directive was the reason for his discharge.

On appeal[2] to this Court, Claimant argues, in essence, that the findings of fact are not supported by substantial evidence, that the Board erred in concluding his actions constituted willful misconduct, and that none of the previous instances of misconduct referenced by Employer were relevant to the issue of willful misconduct. In response, Employer[3] argues that the record supports the findings of fact and that the Board did not err in concluding that

---

[2] This Court's standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

[3] Employer filed a Notice of Intervention in this case.

Claimant's behavior constituted willful misconduct. Employer also argues, in essence, that Claimant's other instances of previous misconduct—namely, missing an emergency call while on-call and being untruthful in court—are sufficient to justify the Board's denial of benefits to Claimant under Section 402(e) of the Law.[4]

Claimant argues that several of the Referee's findings of fact are not supported by substantial evidence.[5] Substantial evidence is defined as relevant evidence upon which a reasonable mind could base a conclusion. *Johnson v. Unemployment Comp. Bd. of Review*, 502 A.2d 738, 740 (Pa. Cmwlth. 1986). In determining whether there is substantial evidence to support the Board's findings, this Court must examine the testimony in the light most favorable to the prevailing party, giving that party the benefit of any inferences that can logically and reasonably be drawn from the evidence. *Id.* A determination as to whether substantial evidence exists to support a finding of fact can only be made upon examination of the record as a whole. *Taylor v. Unemployment Comp. Bd. of Review*, 378 A.2d 829, 831 (Pa. 1977). The Board's findings of fact are conclusive on appeal only so long as the record, taken as a whole, contains substantial evidence to support them. *Penflex, Inc. v. Bryson*, 485 A.2d 359, 365 (Pa. 1984).

[4] The Board did not file a brief.

[5] We recognize that much of Jess' and Clements' testimony about what Claimant said or asked his fellow probation officers was hearsay or even double or triple hearsay. Claimant, however, did not raise a hearsay objection during the hearing and does not raise hearsay as an issue on appeal to this Court. We will, therefore, follow the rule established by *Walker v. Unemployment Compensation Board of Review*, 367 A.2d 366, 370 (Pa. Cmwlth. 1976): "Hearsay evidence, admitted without objection, will be given its natural probative effect and may support a finding of the Board, if it is corroborated by any competent evidence in the record, but a finding of fact based solely on hearsay will not stand."

9

"The fact that [a party] may have produced witnesses who gave a different version of the events, or that [the party] might view the testimony differently than the Board is not grounds for reversal if substantial evidence supports the Board's findings." *Tapco, Inc. v. Unemployment Comp. Bd. of Review*, 650 A.2d 1106, 1108-09 (Pa. Cmwlth. 1994). Similarly, even if evidence exists in the record that could support a contrary conclusion, it does not follow that the findings of fact are not supported by substantial evidence. *Johnson v. Unemployment Comp. Bd. of Review*, 504 A.2d 989, 990 (Pa. Cmwlth. 1986).

Claimant first argues that the findings of fact are not supported by substantial evidence because there is no evidence of rumor-spreading in the record. We note, first, that the Board made no finding of rumor-spreading; rather, the Board found that Claimant "spoke with other Probation Officers to determine what if anything they were aware of regarding the [LaBarre] meeting," and that Claimant "continued speaking with other Probation Officers to determine the purpose or the outcome of the meeting." (R.R. 1; Findings of Fact (F.F.) Nos. 6 & 8.) These findings of fact are supported by Claimant's own testimony, in which he admits that he asked fellow probation officers Boyd, Kozar, and Baronick if they knew anything about the LaBarre meeting. (R.R. 91, 106.)

Next, Claimant argues that Employer did not learn about Claimant's questions regarding the LaBarre meeting until after Claimant was fired, an apparent challenge to the Referee's finding that Claimant was fired "due to the employer determining the claimant had spread rumors or created dissention with the Probation Department." (R.R. 1; F.F. No. 2.) In support of his argument, Claimant cites to testimony from Boyd and Kozar who both testified that they did not tell any supervisor about Claimant's questions until after Claimant's

10

employment was terminated. (R.R. 67-68, 71.) Baronick, however, testified that she told Clements about the conversation she had with Claimant regarding the LaBarre meeting, but did not say whether she told Clements prior to Claimant's termination. (R.R. 59.) Additionally, both Jess and Clements testified that they knew about the questions prior to Claimant's termination. (R.R. 36, 78.) Jess also testified that he sought permission from the President Judge to fire Claimant after "complaints from Supervisor Thomas and Chief Clements that [Claimant] was spreading rumors and gossip about the chief juvenile probation officer." (R.R. 36.) Lastly, the notice sent to Claimant informing him of the meeting at which his employment was terminated cited "allegations that you engaged in misconduct in violation of President Judge Debbie O'Dell Seneca's directive." (R.R. 122.) The Referee's finding that Employer fired Claimant "due to the employer determining the claimant had spread rumors or created dissention with the Probation Department" is supported by substantial evidence.[6]

In his final substantial evidence argument, Claimant challenges Finding of Fact No. 10: "The claimant's letter was sent anonymously and resulted in an investigation of the department which was found to be meeting state requirements." Specifically, Claimant argues that the investigation report, which

---

[6] We note that Claimant argues, based on evidence not admitted at the hearing, that Clements and Jess are, at best, unreliable witnesses and, at worst, committed perjury during the hearing before the Referee. (Claimant's Br. at 18-20.) As discussed below, we may not consider evidence not admitted to the record at the hearing before the Referee. Furthermore, to the extent the findings of fact reflect a credibility determination in favor of Employer's witnesses, we may not disturb that credibility determination on appeal. *See Peak v. Unemployment Comp. Bd. of Review*, 501 A.2d 1383, 1388 (Pa. 1985) ("Questions of credibility and the resolution of evidentiary conflicts are within the sound discretion of the Board, and are not subject to re-evaluation on judicial review.").

11

was not admitted at the hearing, did not determine that the probation office was meeting state requirements. Claimant contends that we may consider this evidence because it is part of the record. (Claimant's Br. at 20.) The Board, however, denied Claimant's request to supplement the record, (R.R. 5), and Claimant has not raised that issue on appeal. Accordingly, we may not consider any evidence not admitted in the hearing before the Referee, including the investigation report.[7] To the extent Claimant's argument is based upon his own testimony and belief that the misconduct complained of in the 2012 letter was, in fact, occurring, we note that Jess testified that "the report said there was no misconduct, there was no basis to the letter." (R.R. 21.) The Board, as the finder of fact, is empowered to resolve conflicts in the evidence, and we may not disturb those resolutions on appeal. *See Peak v. Unemployment Comp. Bd. of Review*, 501 A.2d 1383, 1388 (Pa. 1985) ("Questions of credibility and the resolution of evidentiary conflicts are within the sound discretion of the Board, and are not subject to re-evaluation on judicial review."). Here, it is apparent that the Board credited Jess' testimony over Claimant's, and Finding of Fact No. 10 is, therefore, supported by substantial evidence.

Next, Claimant argues that the Board erred in concluding that his behavior constituted willful misconduct. We agree. Whether or not an employee's actions amount to willful misconduct is a question of law subject to review by this Court. *Nolan v. Unemployment Comp. Bd. of Review*, 425 A.2d 1203, 1205 (Pa. Cmwlth. 1981). Section 402(e) of the Law provides, in part, that an employee

---

[7] We note that if we were to consider the investigation report, it concluded that although there were managerial problems within the office, the allegations contained in the 2012 letter were unfounded. (R.R. 139-43.)

shall be ineligible for compensation for any week in which "his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work." The employer bears the burden of proving that the claimant's unemployment is due to the claimant's willful misconduct. *Walsh v. Unemployment Comp. Bd. of Review*, 943 A.2d 363, 369 (Pa. Cmwlth. 2008). The term "willful misconduct" is not defined by statute. The courts, however, have defined "willful misconduct" as:

> (a) wanton or willful disregard for an employer's interests; (b) deliberate violation of an employer's rule; (c) disregard for standards of behavior which an employer can rightfully expect of an employee; or (d) negligence indicating an intentional disregard of the employer's interest or an employee's duties or obligations.

*Grieb v. Unemployment Comp. Bd. of Review*, 827 A.2d 422, 425 (Pa. 2003). For an employee's conduct to constitute willful misconduct, it must be "of such a degree or recurrence as to manifest culpability, wrongful intent, or evil design, or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer." *Id.* at 425-26.

Here, the Board concluded that the Claimant committed willful misconduct by violating the president judge's directive. The only behavior attributed to Claimant in the findings of fact is that Claimant asked several of his co-workers if they knew anything about a meeting that was taking place. (R.R. 1; F.F. Nos. 6 & 8.) The Board concluded that this behavior was "clearly a violation of the directive by the President Judge." (R.R. 2.) This conclusion is simply unsupported by the facts as found by the Board. The President Judge's directive, according to the findings of fact, stated only "that dissention and undermining of management would not be tolerated." (R.R. 1; F.F. No. 3.) The directive did not

13

prohibit one probation officer from asking another about the goings-on in the office or even prohibit office gossip—it concerned only efforts to undermine management. In fact, Clements specifically testified that probation officers were not prohibited from discussing the goings-on in the office. (R.R. 85 ("CL: An employee is not allowed, in your office, to say to another employee, doesn't so-and-so have a meeting with so-and-so next week? [CLEMENTS]: Oh, they certainly are allowed to say that, yes.").) Critically, the Board did not find that Claimant told his co-workers that LaBarre was out to "gut" Clements or that he made any statement about the purpose of the meeting at all; did not find that Claimant, in asking his questions, had any intent to cause dissention or undermine management; did not find that Claimant's questions were part of a pattern of behavior which caused dissention or undermined management; and made no findings about what effect, if any, Claimant's questions had on the probation office. Without these or similar findings, the findings of facts simply do not support the Board's conclusion that Claimant violated the directive not to cause dissention or undermine management and, thus, committed willful misconduct.

Employer argues, in essence, that Claimant should still be denied benefits on the basis of other previous incidents of misconduct. Employer identified three incidents—a failure to respond to a call while on-call and two instances of being untruthful in court—all of which occurred in 2012. (Employer's Br. at 13-15; R.R. 17, 24-25.) Claimant argues that these incidents are irrelevant to the issue of whether he can be denied benefits because of willful misconduct. We agree. "This Court has repeatedly held that an incident of willful misconduct cannot be temporally remote from the ultimate dismissal and still be the basis for a denial of benefits." *Breininger v. Unemployment Comp. Bd. of Review*,

14

520 A.2d 949, 951 (Pa. Cmwlth. 1987) (finding delay of eight months between incident and termination too great to support willful misconduct); *see also Tundel v. Unemployment Comp. Bd. of Review*, 404 A.2d 434, 436 (Pa. Cmwlth. 1979) (holding that incident predating termination by 25 days could not form basis of willful misconduct). Here, all the incidents referenced by Employer occurred no later than 2012, two years prior to Claimant's termination. Under *Breininger* and *Tundel*, events two years preceding the date of termination are too remote to be the basis for denying Claimant benefits under Section 402(e) of the Law. These incidents are, therefore, irrelevant to the issue of whether Claimant can be denied benefits for willful misconduct.

For the reasons discussed above, the order of the Board is reversed.

_____
P. KEVIN BROBSON, Judge

15

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David L. Scrip, Jr., : 
                   Petitioner : 
                                    : 
          v. :    No. 2138 C.D. 2014
                                      : 
Unemployment Compensation : 
Board of Review, : 
                Respondent : 

## O R D E R

AND NOW, this 29th day of January, 2016, the order of the Unemployment Compensation Board of Review is hereby REVERSED.

_____
P. KEVIN BROBSON, Judge